# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

DEVIN ANDREW SIRES,

        Plaintiff,

vs.

TYSON FOODS, INC., and TYSON
FRESH MEATS, INC.,[1]

        Defendants.

No.  C22-2004-LTS

**MEMORANDUM
OPINION AND ORDER**

_____

## I.    INTRODUCTION

This matter is before the court on defendants' motion (Doc. 67) for summary judgment, along with three motions (Docs. 42, 45, 86) for summary judgment filed by plaintiff Devin Sires.[2]  Oral argument is not necessary.  *See* Local Rule 7(c).

## II.    RELEVANT PROCEDURAL HISTORY

On January 26, 2022, Sires filed a pro se "Complaint For A Civil Case" (the complaint) in the Iowa District Court for Black Hawk County.  Doc. 2.  The complaint includes three claims, which will be discussed below.  On February 16, 2022, defendants removed the case to this court based on diversity of citizenship.  Doc. 1.

---

[1] One of the issues raised in defendants' motion (Doc. 67) for summary judgment is that Sires was employed only by Tyson Fresh Meats, Inc., such that Tyson Foods, Inc., should not be a defendant.  Sires denies this but cites no evidence showing Tyson Foods employed him.  *See* Doc. 74-1 at 1.  Because this issue is not relevant to disposition of this case, I need not address it.  I will refer to the defendants, collectively, as "defendants" or "Tyson."

[2] I will refer to Devin Sires as Sires, and his wife, AnnMarie Sires, as AnnMarie.

Defendants filed an answer (Doc. 4) on February 23, 2022. On March 4, 2022, Sires filed a document (Doc. 5) that the Clerk's office docketed as a motion for summary judgment. Defendants filed a resistance (Doc. 8) and Sires filed a reply (Doc. 11). On March 15, 2022, Sires filed a document (Doc. 7) that was titled and docketed as a motion in limine. Defendants filed a resistance (Doc. 14). On May 6, 2022, defendants filed, with leave of court, an amended answer (Doc. 25).

On July 12, 2022, Sires filed a second motion (Doc. 29) that was docketed as a motion for (partial) summary judgment. On August 5, 2022, defendants filed a resistance (Docs. 32, 33). On October 11, 2022, Sires filed his third motion (Doc. 42) for summary judgment. Three days later, on October 14, 2022, Sires filed his fourth motion (Doc. 45) for summary judgment. Defendants filed a joint resistance (Doc. 60) to both motions.

On October 26, 2022, the court granted Sires' request to amend his complaint adding Tyson Fresh Meats, Inc., as a defendant. *See* Doc. 55. On November 3, 2022, defendants filed a second amended answer. Doc. 59.

On December 14, 2022, defendants filed a motion (Doc. 67) for summary judgment, along with a statement (Doc. 67-1) of material facts and an appendix (Doc. 67-4, 67-5). On January 9, 2023, Sires filed a resistance (Doc. 74), along with a response to the statement of fact (Doc. 74-1) and an appendix (Doc. 74-2). On January 17, 2023, defendants filed a reply (Doc. 76).

On January 17, 2023, Sires filed two motions (Docs. 80, 81) for sanctions. On January 31, 2023, defendants filed two responses (Docs. 82, 83). On February 15, 2023, Sires filed his fifth motion (Doc. 86) for summary judgment and his third motion (Doc. 88) for sanctions. On March 3, 2023, defendants filed a resistance (Doc. 91) to the third motion for sanctions and on March 8, 2023, defendants filed a resistance (Doc. 92) to the fifth motion for summary judgment. On March 20, 2023, plaintiff filed a reply (Doc. 95).

On March 30, 2023, I entered an order (Doc. 96) denying: (1) Sires' first motion (Doc. 5) for summary judgment; (2) Sires' motion (Doc. 7) in limine; and (3) Sires'

2

second motion (Doc. 29) for summary judgment.  On April 13, 2023, Judge Roberts denied all three of Sires' motions (Docs. 80, 81, 88) for sanctions.  Sires subsequently filed, and then withdrew, a second motion in limine.  *See* Docs. 98, 101, 102.

## III.  RELEVANT FACTS

### A.  Allegations from the Complaint

In his complaint (Doc. 2), as amended (Doc. 59), Sires makes three claims.  In Claim One, Sires alleges defendants committed "libel per se" and "slander per se." Specifically, Sires alleges employees of Tyson made defamatory statements about Sires' involvement in an act of vandalism to Sires, other Tyson employees, law enforcement and other potential employers.  In Claim Two Sires alleges "negligent misinformation, and fraud." He contends that Tyson engaged in fraud both by "negligent misinformation" and by "alleging misrepresentation of knowledge of state of mind."  Doc. 2 at 4. However, it is not clear what, exactly, Sires contends was fraudulently or negligently misrepresented.  In Claim Three, Sires seems to allege that Tyson breached a contract.[3]

### B.  Undisputed Facts

In August 2021, Sires was employed as a general manager in warehousing at a Tyson facility in Waterloo, Iowa.[4]  When he was initially hired in 2015, Sires signed a document confirming that his employment was at will:

---

[3] Sires did not attach a written agreement to the complaint but references various Tyson policies.

[4] Sires denied or qualified most of the paragraphs set out in defendants' statement of undisputed facts, but frequently provided no citations to portions of the record supporting his denials and qualifications, thus violating both Fed. R. Civ. P. 56(c) and LR 56(b).  As contemplated by Fed. R. Civ. P. 56(e)(2) and LR 56(b), I will consider as undisputed all facts that Sires denied or qualified without proper citations to the record.  By contrast, when Tyson denied or clarified Sires' statement of additional facts, it did so with citations to the record.  However, several of Tyson's citations are incorrect and some of its denials are not supported by the record.  *See, e.g.*, Doc. 76 at 16 (denying that "Sires termination was emailed to ninety-fire employees, thirty-four of which ware non-management employees.").  The citation Sires provided for that fact is

3

The preceding information sets forth general policies and guidelines concerning the position for which you have been hired. These policies and guidelines are subject to change without notice by the Company from time to time to deal with changing situations. In all circumstances employment is at will.

On July 21, 2021, when Sires was promoted to warehouse manager, the promotion document stated that it "is not intended nor should it be considered a contract of employment for a definite or indefinite period. If employed, you will be considered an employee at will." Sires affirmed during his deposition that he was an "at will" employee who could be terminated for "any lawful reason."

Tyson has numerous employee policies. They include an internal investigations policy, a separation policy, team member rules of conduct and an anti-retaliation policy. Prior to the incident that led to his discharge, Sires was disciplined by Tyson on three occasions. Additionally, while employed by Tyson, Sires had a criminal history that included convictions for drunk driving, failure to pay child support, burglary and domestic abuse.

On August 17, 2021, Sires and his wife AnnMarie, who worked at Tyson as a nurse manger, encountered John Roddy, another Tyson employee, in the Tyson parking lot. AnnMarie was ticketing cars, which was not her job, and ticketed Roddy's car. Roddy objected and Sires interceded. Roddy alleged that a verbal altercation ensued and that it continued until Roddy was in his car. Sires denies the exchange he had with Roddy was hostile. Regardless, video footage confirms that Sires and Roddy had an exchange in the parking lot, as do additional witness statements.

Roddy immediately reported the incident to Tyson's human resources (HR) department. The next day, Roddy's car's tires were slashed while his car was in the

---

accurate. Tyson's denial stated that the email contained only an "opinion." However, that is not supported by a review of the email. *See* Doc. 74-3 at 64 (email sent September 11, 2021, including an attachment that stated Sires was subject to the employment action of termination for gross misconduct and that he could not be rehired).

Tyson parking lot. Roddy reported the vandalism to Tyson and told Tyson officials he believed Sires was the culprit. He also reported it to law enforcement. Roddy reported, and other employees confirmed, that there was a history of hostile feelings between Roddy and Sires.[5] Roddy stated he believed his tires were slashed in retaliation for the confrontation he had with Sires the previous day. Tyson's policies prohibit retaliation and also prohibit destruction/vandalism of employee property.

Lee Avina, a Tyson supervisor, interviewed Roddy and then assigned the vandalism investigation to Teri Rottinghaus, an HR manager. At the time of the investigation, Rottinghaus had been an HR manager at Tyson for 13 years and had conducted at least 20 investigations related to potentially-criminal conduct. Avina also communicated to Rottinghaus that Roddy had alleged Sires engaged in retaliation by slashing his tires.

Rottinghaus did not personally interview Roddy but did review parking lot video footage. The video showed a dark vehicle, believed to be a Mitsubishi Eclipse, driving into the parking lot and parking near Roddy's vehicle.[6] The video then shows an individual getting out of the passage side of the car, approaching Roddy's vehicle, bending down and making "slashing" motions. Comparing that video to the security video of Sires' and Roddy's confrontation the previous day, Rottinghaus believed the tire-slasher to be approximately the size and stature of Sires, with the same type of gait. However, the person's ethnicity could not be ascertained from the video.

The video showed the person getting back into the passenger side of the dark car, with the car then driving away. The video does not show the vehicle's license plate.

---

[5] There are several indications in the summary judgment record that Roddy was not generally perceived to be a pleasant coworker.

[6] Tyson employees Travis John and Mike Gustafson were involved in collecting evidence, such as retrieving video footage. John suspected that a different employee, not Sires, slashed Roddy's tires.

Rottinghaus speculated the car was a Mitsubishi Eclipse. Rottinghaus stated that Sires' management team, Mike Herber and Mike Eyestone, indicated that Sires had that type of vehicle. Rottinghaus then drove past Sires' home and confirmed the presence of a dark colored Mitsubishi Eclipse with the license plate number JEM118. Rottinghaus asked another human resource manager, Katie Schoepske, to drive to Sires' home and take a picture of the vehicle, which she did.[7]

Along with Sires' management team, Rottinghaus also conferred with Plant Manager Petersen. Rottinghaus interviewed Sires and told him she believed Sires vandalized Roddy's vehicle. Sires denied doing so. Nonetheless, based on her investigation, Rottinghaus concluded that Sires committed the vandalism of Roddy's car. At Tyson, the discharge of a manager requires the approval of an HR director. Rottinghaus conferred with her supervisor, HR director Lonny Jepsen, who approved Sires' discharge.[8]

On September 9, 2021, Rottinghaus, along with Sires' direct supervisors Herber and Eyestone, met with Sires and told him that the investigation concluded he engaged in gross misconduct by committing property vandalism and that Tyson was terminating his employment. Gross misconduct is a term of art Tyson uses for discharged employees who are not eligible to be rehired. A specific example of gross misconduct in the Tyson Rules of Conduct is "intentional destruction/misuse of company or team member property." Because the vandalism investigation resulted in Sires' discharge, an additional retaliation investigation was not completed.

---

[7] Sires admits that his family owns the vehicle.

[8] During her deposition, Rottinghaus was somewhat confused about how many people above her in the organization needed to sign off on the discharge of a manger. Specifically, she indicated it was possible that the plant manager needed to sign off on it. However, Jepsen testified that he could and did make the decision. Regardless, Rottinghaus testified, and Jepsen did not dispute, that Petersen was aware of the decision to terminate Sires' employment.

Sires met with Jepsen and asked that he review the investigation. Sires told Jepsen that law enforcement had indicated to him that he was not a suspect in the vandalism. Jepsen gave Sires a week to provide documentation to that claim. Sires did not do so. Contemporaneously, Jepsen reviewed the evidence and spoke with Herber and Eyestone, who were "adamant" that based on their review of the videos, the person who had a confrontation with Roddy was the same person who slashed the tires. After review, Jepsen continued to approve the termination of Sires' employment.

The day after Sires was discharged, an email was sent to 95 Tyson employees that contained a report of employment actions. That email indicated that Sires was discharged for gross misconduct. Tyson denies telling additional employees, including Roddy, that Sires was fired and there is no evidence in the record that it did. Tyson cooperated with law enforcement and offered to provide the videos and the information about Sires' family having a Mitsubishi Eclipse with the license plate number JEM118.

Sires and AnnMarie maintain that Sires is innocent of vandalizing Roddy's car. AnnMarie states that Sires was at home at the time of vandalism. AnnMarie sent numerous communications to various people at Tyson advocating on Sires' behalf.

Since his discharge from Tyson, Sires has been denied several employment opportunities for which he has applied. Sires states he was not hired by "Ryder" in Cedar Rapids after he disclosed that he left Tyson involuntarily. Similarly, Sires states he was not hired by Target after he was asked why he had been discharged from Tyson. Sires has not been rehired by Tyson. There is no evidence in the record that any employer (other than Tyson) declined to hire Sires because of his discharge by Tyson, or that anyone other than Sires himself told any potential employers about the circumstances of his discharge. Several other employers have declined to hire Sires despite not asking anything about his employment at Tyson.

7

## IV. DISCUSSION

### A. Summary Judgment Standards

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there

8

is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

## B.    *Tyson's Motion for Summary Judgment*

### 1.    *The Parties' Arguments*

Tyson argues that Sires has failed to raise any genuine dispute of material fact that would preclude summary judgment. Regarding Sires' first claim, Tyson argues that: (1) Sires has failed to create a genuine issue of material fact that Tyson published defamatory material; (2) any information Tyson provided to anyone was true; (3) any communication Tyson made is privileged; and (4) any self-publication is either privileged or true.

Regarding Sires' second claim, Tyson argues that if Sires is making a claim for negligent misrepresentation, it fails because that tort applies only when an entity in the business of providing information is sued by a customer or other entity that has a pecuniary interest in the information. Tyson argues it is not in the business of providing information and, even it was, Sires is not a customer. Tyson also argues that if Sires is

9

making a claim related to fraud, the claim fail because Sires has failed to plead the claim with the level of specificity required by the Fed. R. Civ. P. 9.

Regarding Sires' third claim, Tyson argues that Sires failed to prove the existence of a unilateral contract and that even if Sires pointed to particular language that might otherwise support the existence of a unilateral contract, Tyson repeatedly disclaimed the creation of a unilateral contract by reaffirming Sires' at will status.

In his response, Sires addresses only his defamation claim. He argues that the only evidence that Tyson relied on to fire him was the "one and half page word document created by HR manager Teri Rottinghaus." Doc. 74 at 17. He goes on to argue that his discharge was not supported by evidence and that Tyson should not be granted any privilege regarding its publication of his discharge to law enforcement.

### 2.    *Analysis*

#### a.    *Claim One*

As noted above, in Claim One Sires alleges libel and slander, otherwise referred to as defamation. Specifically, Sires complains (1) that the facts surrounding his termination were told to him, (2) that he was compelled to tell his wife and potential employers about those alleged facts, (3) that the fact that he was terminated was told to other Tyson employees and (4) that Tyson reported the incident to law enforcement.

> Defamation involves the twin torts of libel and slander. *Theisen v. Covenant Med. Ctr.*, 636 N.W.2d 74, 83 (Iowa 2001) (*citing Lara v. Thomas*, 512 N.W.2d 777, 785 (1994)); … *Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 768 (Iowa 2006) ("Libel is generally a written publication of defamatory matter, and slander is generally an oral publication of such matter.") (quoting *Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 221 (Iowa 1998)). There are two types of libel: libel per se and libel per quod. *Schlegel*, 585 N.W.2d at 221.

*Mechdyne Corp. v. Garwood*, 707 F. Supp. 2d 864, 873 (S.D. Iowa 2009). "An attack on the integrity and moral character of a party is libelous per se." *Vinson v. Linn–Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 115–16 (Iowa 1984).

10

> "If a statement is clear and unambiguous, the issue of whether the statement is libelous per se is for the court. If the court determines a statement is libelous per se as a matter of law, the burden shifts to the defendant to prove the statement was used and understood in a different sense." *Kiesau v. Bantz*, 686 N.W.2d 164, 175 (Iowa 2004) (citations omitted).

*Mechdyne Corp.*, 707 F. Supp. 2d at 873. "The determination of whether a publication is libelous per se is for the court in the first instance. This determination is made by reference to the statements made, without reference to the defamatory sense in which plaintiff claims such statements were intended and understood." *Ragland v. Household Fin. Corp.*, 254 Iowa 976, 119 N.W.2d 788, 790 (1963). In the case of libel per se, damage is presumed. *Schlegel,* 585 N.W.2d at 222. Statements qualifying as libel per se fall into four general categories: "imputation of (1) certain indictable crimes, (2) loathsome disease, (3) incompetence in occupation, and (4) unchastity." *Barreca v. Nickolas*, 683 N.W.2d 111, 116 (Iowa 2004).

Meanwhile, "[a] statement is libelous per quod if it is necessary to refer to facts or circumstances beyond the words actually used to establish the defamation." *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996). To make a defamation per quod claim, a plaintiff must prove an injury, such as an injury to reputation. *Kiesau*, 686 N.W.2d at 175. To the extent Sires has alleged a defamation claim, it is per quod.

> "[T]ruth is a complete defense to a defamation action ...." *Hovey v. Iowa State Daily Publ'n Bd., Inc.*, 372 N.W.2d 253, 255 (Iowa 1985). Iowa does not require defendants prove literal truth, only "substantial truth." *Behr v. Meredith Corp.*, 414 N.W.2d 339, 342 (Iowa 1987). This means that the defendant need not show the truth of each detail "as long as the 'sting' or 'gist' of the defamatory charge is substantially true." *Id*. (citing *Hovey*, 372 N.W.2d at 255). At the summary-judgment stage, a court must ask "whether the plaintiff would have been exposed to any more opprobrium had the publication been free of error." *Id*.

*Olson v. City of N. Liberty*, 451 F. Supp. 3d 1010, 1025 (S.D. Iowa 2020)

Even viewing all of the evidence most favorably to Sires, he cannot prove defamation under any of the theories he asserts. I turn first to the claim that Tyson

11

defamed Sires by reporting the vandalism, and the fact that Tyson believed Sires committed it, to law enforcement. The evidence in the record indicates that only Roddy, not Tyson, reported the incident to law enforcement. While Sires makes the self-serving allegation the report was made by Tyson, the undisputed facts show that Roddy reported the incident and that Tyson then cooperated with law enforcement. Once Tyson began cooperating, there is no allegation that Tyson made any statements that were not true. Assuming Tyson provided law enforcement with the videos, there is no basis to find that those videos are false. Sires admits that his family owns the type of vehicle depicted in the video and owns the specific vehicle Rottinghaus observed outside his residence.

Finally, there is no dispute that Tyson did, in fact, determine that Sires committed the vandalism at issue. Whether or not this determination was accurate, there is no doubt that Tyson made this finding. Thus, Tyson did not publish the allegation to law enforcement and, in any event, what it did tell law enforcement was true.

Even assuming that Tyson reported the incident to law enforcement, there is no evidence in the record that Sires suffered injury as a result. For example, there is no evidence that Sires was investigated or prosecuted. Sires agrees that law enforcement declined to consider him a suspect. As noted above, a defamation injury can include an injury to reputation, but Sires has placed no evidence in the record, other than self-serving statements in his deposition, that his reputation was damaged by any communication Tyson made to law enforcement. Moreover, as noted above, at the time this incident occurred Sires already had a significant criminal record.

I turn next to Sires' claim that he was defamed when he was told about the reasons for his discharge, or by being forced to tell others about those reasons. The Iowa Supreme Court has stated that "a qualified privilege attaches to an employer's statements made to an employee concerning reasons for the employee's discharge." *Theisen*, 636 N.W.2d at 84 (internal citations omitted). The Court explained:

> Theisen claims that Covenant [his former employer] defamed him, both
> through Theisen's compelled self-publication of Covenant's accusation of

sexual harassment and through security officer Roger Shook's action in escorting Theisen out of the building following his suspension. The district court rejected these claims, ruling that an employer is entitled to qualified immunity for statements made to an employee to protect the employer's interest, and that the privilege extends to situations in which the employee feels compelled to repeat such statements... we are convinced that the district court correctly applied the law to the undisputed record before us.

636 N.W.2d at 83. The Court went on to say that:

a qualified privilege attaches to an employer's statements made to an employee concerning reasons for the employee's discharge. *Id*.; *Lewis v. Equitable Life Assurance Soc'y of the United States*, 389 N.W.2d 876, 889–90 (Minn. 1986). The privilege may be lost, however, if the speaker acts with actual malice, or exceeds or abuses the privilege through, for example, *excessive* publication or through publication to persons other than those who have a legitimate interest in the subject of the statements. 50 Am. Jur.2d Libel and Slander §§ 279, 280, 284, at 554–55, 559–60, 565–66.

*Theisen*, 636 N.W.2d at 84.

In this case, there is no genuine issue of material fact supporting a finding that Tyson engaged in excessive publication or otherwise published the fact that Sires was fired beyond the type of publication – to Sires and other employees involved in Tyson's operation – that is covered by Iowa's qualified privilege. Sires makes much of the fact that Tyson relied on Rottinghaus' investigation notes to make the decision to fire him. He suggests that the investigation was faulty and maintains that he did not slash Roddy's tires. Whether or not Tyson's finding was correct is not at issue. Indeed, Sires' argument is the exact argument rejected in *Theisen*:

Regardless of the truth or falsity of [the employer's] statement, it was plainly offered as an explanation for Theisen's termination, a matter clearly encompassed within their employer-employee relationship. The statement was made in good faith, based on the identification of [plaintiff as the wrong doer] by four persons. [The employer] had an undisputed interest in the subject of the statement, which was made as part of a sexual harassment investigation. And the statement was made during a closed-door meeting with Theisen's supervisor and the director of employee services, a proper time and place to discuss such an accusation with limited parties. Thus [the

13

employer's] statement easily falls within the criteria necessary to establish a qualified privilege as a matter of law... [T]he only question remaining is whether qualified immunity applies when the person publishing the statement is the party injured by the statement rather than the party who originally made the statement. We are convinced that it must. As wisely noted by the Minnesota Supreme Court, it makes little sense to deny the privilege when the same communication is being conveyed by a different mode of publication. *Lewis*, 389 N.W.2d at 890. Moreover, in the employment context, the qualified privilege is the only effective means of preventing every termination decision from automatically becoming a case of defamation. *Id*. As the Minnesota court observed,

> [i]t is in the public interest that information regarding an employee's discharge be readily available to the discharged employee and to prospective employers, and we are concerned that, unless a significant privilege is recognized by the courts, employers will decline to inform employees of reasons for discharges.

*Id*; accord *Thompto*, 871 F. Supp. at 1128 (holding that limiting the privilege to statements made only by employers and not by employees would "create an insupportable conundrum of holding defendants liable for statements qualified in one context but not in a context that has nothing to do with the defendants' conduct"). We think this reasoning is sound and, therefore, recognize and adopt a qualified privilege for statements made by employers to employees concerning the reasons for an employee's discharge regardless of whether the employer or employee publishes the statement.

*Theisen*, 636 N.W.2d 84–85. Similarly, in the context of another case in which a discharged employee claimed defamation, this court stated:

> The Defendants argue, and the Court agrees, that Mr. Wisner has failed to state a claim for defamation. Mr. Wisner fails to allege any type of publication of alleged defamation.[] Even if Mr. Wisner's allegations were true, and then Defendants did terminate him for an unlawful reason, there is absolutely no allegation that the Defendants communicated the news of Mr. Wisner's termination to anyone.

*Wisner v. City of Sioux City*, No. 14-CV-4031-DEO, 2015 WL 1279802, at *5 (N.D. Iowa Mar. 20, 2015).

There is no evidence in the record suggesting that Tyson acted with malice or knowingly reached a false conclusion concerning the slashing of Roddy's tires. Rather, the undisputed evidence is that Tyson took reasonable steps to investigate the incident and then conducted a supplementary investigation at Sires' request. This is not a situation in which the privilege plainly does not apply, nor one in which there is a fact question about whether it should apply. *See Olson*, 451 F. Supp. 3d at 1024 (stating that the "jury must resolve whether Defendants abused their qualified privilege because they based their accusations on vague, unverified gossip that they had reason to doubt."). Rather this is a straightforward application of the holding in *Theisen*. Sires was accused of vandalism, Tyson investigated, made a decision based on evidence that Sires committed the vandalism and then terminated his employment. The termination decision was made pursuant to company policy and was not communicated unnecessarily. Thus, Tyson's communications were privileged and Tyson is entitled to the same privilege even to the extent Sires felt compelled to self-publish the information to third parties, such as his wife and future employers.

Even if Tyson's communications were arguably not privileged, Sires' claim would still fail. Publication means publication to someone other than the subject of the allegedly defamatory statement. *Belcher v. Little*, 315 N.W.2d 734, 737 (Iowa 1982). To the extent Tyson communicated the information to Sires, that communication did not constitute publication. Publication to the subject of the defamatory statement becomes problematic only when there is forced republication. Here, Sires alleges he was forced to republish the defamation to others such as his wife and future employers. Even if this is true, nothing in the record creates a genuine issue of material fact that Sires was injured by these instances of republication. His wife, AnnMarie, does not believe Sires committed the vandalism. As for potential employers, Sires has placed no facts in the record demonstrating he was rejected by any other employer because he told them about this discharge by Tyson. Rather, the only information in the record is that on a few instances Sires told potential employers he was fired and then did not receive job offers.

15

Sires admits that he has not been hired for numerous other positions, even when he did not disclose his history with Tyson. To the extent Sires was not rehired by Tyson, Tyson's knowledge of the firing was based on its own knowledge, not on Sires' republication. Thus, Sires has failed to create a genuine issue of fact that he was damaged by any instance of the republication.

For these reasons, Tyson's motion for summary judgment will be granted as to Claim One.

### b.    Claim Two

As noted above, in Claim Two, Sires seems to allege two causes of action, "negligent misinformation" and "fraud." It is possible he is attempting to allege fraudulent misrepresentation. Sires states:

> B.     For a claim against Defendant of Fraud – Negligent Misinformation, and Fraud – Alleging misrepresentation of knowledge or state of mind, Plaintiff states:
>
> 1.     Plaintiff was employed at, (see I.B.).
> 2.     Actor(s) of Defendant is in the business or profession Human Resources, to include, internal investigations of incidents which may give cause for Disciplinary Action, also to include correspondence with local law enforcement when necessary or requested.
> 3.     Plaintiff Requested certain information from Actor(s) of Defendant.
> 4.     Actor(s) of Defendant had specific knowledge of Plaintiff's need for the information and provided the information in the course of a meeting(s).
> 5.     Actor(s) negligently provided incorrect information to the Plaintiff.
> 6.     Plaintiff reasonably relied up the information under circumstances in which Defendant knew or should have known that Plaintiff was relying upon the information.
>
> Furthermore,
> 7.      Defendant further stated to Plaintiff that Defendant knew (see III.A.5.b,c,d,e,f,g,i, III.A.8.d.).

8.  In fact, Defendant had no knowledge of the matter(s) whatsoever, and Defendant's statement(s) that Defendant did so know was false, known to be false and made with intent to deceive Plaintiff.

9.  Plaintiff alleges damages in loss of employment an infliction of emotional harm, e.g.: Plaintiff also incurred costs, expenses, counsel fees, loss of time and inconvenience in bringing this action.

Doc. 2 at 4.

To the extent Sires is making a claim of negligent misrepresentation, Tyson correctly states (1) that such a cause of action is actionable in Iowa only against entities that are in the business of providing information and (2) that the proper plaintiffs to bring that claim are those who received the information the entity was in the business of providing.

> Although the Restatement supports a broader view, we have determined that this duty arises only when the information is provided by persons in the business or profession of supplying information to others. Hendricks v. Great Plains Supply Co., 609 N.W.2d 486, 492 (Iowa 2000); *see Meier v. Alfa–Laval, Inc.*, 454 N.W.2d 576, 581 (Iowa 1990) (providing false information is not actionable if the person is not in the business or profession of supplying information) … Our examination of both section 552 and our own cases reveals the business or commercial requirement for the tort does not actually concern the subject matter of the transaction between the plaintiff and the defendant, but requires the defendant to be in the business or profession of supplying information for the guidance of others. This is the fundamental requirement to support the imposition of a duty, which is essential for all negligence claims. *See Alderson v. Rockwell Int'l Corp.*, 561 N.W.2d 34, 36 (Iowa 1997) ("[o]ur general rule is that negligent misrepresentation under Restatement section 552 applies only to a defendant who is in the business [or profession] of supplying information to others"). Additionally, the language of section 552 requires the information to not only be supplied "for the guidance of others," but "for the guidance of others in their business transactions."

*Sain v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115, 124-27 (Iowa 2001); *see also Dinsdale Constr., LLC v. Lumber Specialties, Ltd.*, 888 N.W.2d 644, 653 (Iowa 2016)

17

(affirming that *Sain* set out the applicable standard and that there must be a pecuniary type of interest between the parties, relating to the information provided, for a claim of negligent misrepresentation to be actionable).

In this case, Sires has failed to establish a triable claim of negligent misrepresentation for at least two reasons. First, his complaint (Doc. 2) does not allege any specific information that Tyson was in the business of providing to him, nor does he allege what specific statement Tyson made to him beyond citations to Tyson's various policies. Second, Sires has failed to allege any pecuniary type of interest related to the information supplied to him by Tyson.[9]

Similarly, to the extent that Sires is attempting to bring any type of intentional fraud claim, he failed to properly allege such a claim, much less create a genuine issue of material fact that it occurred. Fraud claims are subject to the heightened pleading standard set out in Fed. R. Civ. P. 9.

> When pleading fraud claims, both statutory and common law, "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 665 (8th Cir. 2012) (statutory); *Trooien v. Mansour*, 608 F.3d 1020, 1028 (8th Cir. 2010) (common law). The degree of particularity required by Rule 9(b) depends on the nature of the case. *E-Shops Corp.*, 678 F.3d at 663. But conclusory allegations that the defendant's conduct was fraudulent and deceptive do not satisfy Rule 9(b). *Id.* Instead, as to the alleged fraud, the complaint must set forth the who, what, when, where, and how. *Id.*

---

[9] As noted above, Sires' response to Tyson's motion for summary judgment (Doc. 74) does not address Tyson's motion regarding Claim Two or Claim Three except to state:

> Evidence exist in the identification of Defendant's reckless negligence and malice. Evidence exist to Sires agreement with Tyson Foods, Sires damages in reputation, the misrepresentation of Tyson agents, and of the numerous falsities in Tyson's story.

*Id.*, at 19-20. Additionally, Sires' three motions (Docs. 42, 45, 86) for summary judgment deal exclusively with the defamation issue.

*Cleveland v. Whirlpool Corp.*, 550 F. Supp. 3d 660, 673 (D. Minn. 2021). "'A district court may enter summary judgment dismissing a complaint alleging fraud if the complaint fails to satisfy the requirements of Rule 9(b).' *Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1070 (8th Cir. 1995)." *Thayer v. Planned Parenthood of the Heartland, Inc.*, 11 F.4th 934, 939 (8th Cir. 2021).

To establish common law fraud under Iowa law, a plaintiff must establish: "(1) a material misrepresentation (2) made knowingly (scienter) (3) with the intent to induce the plaintiff to act or refrain from acting, (4) upon which the plaintiff justifiably relies (5) with damages." *Beck v. Kapalis*, 302 N.W.2d 90, 94 (Iowa 1981). Fraudulent misrepresentation requires:

> (1) a representation; (2) falsity; (3) materiality; (4) scienter; (5) intent; (6) justifiable reliance; and (7) resulting injury. *See Smidt v. Porter*, 695 N.W.2d 9, 22 (Iowa 2005). Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." This means a plaintiff must identify the "who, what, when, where, and how: the first paragraph of any newspaper story." *See Great Plains Trust Co. v. Union Pac. R. Co.*, 492 F.3d 986, 995 (8th Cir. 2007) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990)). "Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) (quoting *Commercial Property Invs. Inc. v. Quality Inns Int'l Inc.*, 61 F.3d 639, 644 (8th Cir. 1995)).

*Bucco v. W. Iowa Tech Cmty. Coll.*, 555 F. Supp. 3d 628, 654–55 (N.D. Iowa 2021).

Sires has failed to allege, let alone show, that any specific representations made by Tyson were fraudulent. Nor has he alleged or established that Tyson had specific intent to induce action or inaction from Sires. Rather, in Claim Two, Sires simply complains about the allegedly-inadequate manner in which Tyson conducted the investigation into the tire-slashing incident. A general statement that Tyson did not follow his interpretation of Tyson's various policies does not come close to satisfying the

19

heightened requirements for pleading and proving fraud. Tyson is entitled to summary judgment on Claim Two.

### c. Claim Three

Claim Three states:

C. In a claim against Defendant for breach of agreement, Plaintiff states:
    1. On October 19th, 2015, Plaintiff and Defendant entered into an agreement.
    2. Provisions of the agreement provides as follows:

    [Sires lists various Tyson policies]

    3. A claim within the scope of the agreement was made against Plaintiff.
    4. Plaintiff satisfied claim.
    5. Plaintiff demanded that Defendant indemnify Plaintiff as provided in the agreement but Defendant has refused to do so.
    6. Plaintiff alleges damages in loss of income and benefits, e.g.: Plaintiff also incurred costs, expenses, counsel fees, loss of time and inconvenience in bringing this action.

Doc. 2 at 5-6. As with Claim Two, Sires has failed to raise a genuine issue of material fact as to whether Tyson violated a contract.

Under Iowa law, and in the absence of any employment agreement to the contrary, employees are presumed to be employed at will and may be discharged at any time. *Fogel v. Trustees of Iowa College*, 446 N.W.2d 451, 455 (Iowa 1989). In his complaint, Sires vaguely alleges that he had an "agreement" with Tyson and then lists Tyson's various employment policies. Thus, I will assume he is attempting to make the claim that one or more of Tyson's policies created a unilateral contract.

[If a plaintiff employee] had no written employment contract, he was an at-will employee unless, [an employee handbook or policy book] created a unilateral contract "guarantee[ing] an employee that discharge will occur only for cause or under certain conditions." *French v. Foods, Inc.*, 495 N.W.2d 768, 770 (Iowa 1993). An employee policy manual creates a

20

> unilateral contract if "(1) the handbook is sufficiently definite in its terms to create an offer; (2) the handbook has been communicated to and accepted by the employee so as to create an acceptance; and (3) the employee has continued working, so as to provide consideration." *Fogel*, 446 N.W.2d at 456 (emphasis in original). Whether an employer's policy manual binds the parties in contract is a question of law, unless the document is ambiguous. *Thompson v. City of Des Moines*, 564 N.W.2d 839, 844 (Iowa 1997).

*Bradshaw v. Brown Grp., Inc.*, 258 F.3d 847, 849 (8th Cir. 2001). "The party relying on the unilateral contract carries the burden to prove its existence." *Thompson v. City of Des Moines*, 564 N.W.2d 839, 844 (Iowa 1997). To prove that a document created a unilateral contract, Sires must prove that he was guaranteed employment protection:

> When deciding whether a policy is sufficiently definite in its terms as to create an offer, the Court must determine "whether a reasonable employee, upon reading the policy, would believe they had been guaranteed certain protections by their employer." *Fesler v. Whelen Eng'g Co., Inc.*, 794 F.Supp.2d 994, 1014 (S.D. Iowa 2011) (citing *Jones v. Lake Park Care Center, Inc.*, 569 N.W.2d 369, 374 (Iowa 1997)). The Court generally considers three factors in making this determination: "(1) whether the personnel polic[ies] … constitute mere guides or directives; (2) whether the language of the [policy and] procedures is detailed and definite or general and vague; and (3) whether the employer has the power to alter the procedures at will." *Id*. Additionally, the Court will look at any disclaimers in making a sufficiency determination. *See Anderson*, 540 N.W.2d at 288; *Kartheiser v. Am. Nat. Can Co.*, 84 F.Supp.2d 1008, 1015 (S.D. Iowa 1999). In the absence of ambiguity, whether an employee handbook or policy constitutes a contract is a question of law. *French*, 495 N.W.2d at 770.

*Anderson v. Bristol, Inc.*, 936 F. Supp. 2d 1039, 1069–70 (S.D. Iowa 2013).

Sires has failed to raise a genuine issue of fact that a unilateral contract existed such that Tyson committed a breach of contract by terminating his employment. As noted above, Sires (1) is presumed to be an at will employee and (2) has the burden to prove he is not an at will employee. In attempting to meet his burden, Sires cites (by name and section only) various Tyson codes and policies. He makes no specific argument as to

21

how any particular policy at Tyson elevated his status to anything other than that of an at-will employee.

In any event, none of the documents contained in the record (including Sires' original offer of employment, the document offering him a promotion to manager, or the various policies included in the parties' appendices) make any specific guarantees that a reasonable employee would understand to protect or guarantee their employment. In addition, and while not determinative, it is relevant that Tyson included in its various documents (including the offer of employment signed by Sires) a notice disclaiming the creation of any contract and affirming at-will employment. For all of these reasons, Tyson is entitled to summary judgment on Claim Three.[10]

**C.    Sires' Motions for Summary Judgment**

Because Tyson is entitled to summary judgment on all claims Sires asserts in this case, Sires' motions for summary judgment will be denied as moot.

---

[10] Sires also cites the United Food and Commercial Workers collective bargaining agreement (CBA). *See* Doc. 67-3 at 28. However, nothing in the record suggests Sires was a member of a union or was otherwise protected by a CBA. In addition, during Sires' deposition testimony, he seemed to allege that Tyson violated its anti-retaliation policy by terminating his employment. Even if I allowed Sires to assert this unpled theory, it would fail. The policy (Doc. 74-3 at 2-3) states that "Tyson Foods prohibits all form of retaliation against a Team Member who, in good faith reports ... misconduct ... to Tyson or to a government agency." There is no evidence that Tyson, as opposed to Roddy, reported any alleged misconduct. The policy goes on to state that a team member is protected if he or she assists in an investigation by Tyson or a government agency. Nothing in the anti-retaliation policy gives Sires protection from his own alleged misconduct simply because he spoke to Rottinghaus and Jepsen during their investigations. Nor is there evidence suggesting that Tyson's decision to discharge Sires was based on his assistance in the investigation, as opposed to Tyson's finding that Sires committed an act of vandalism.

## V.    CONCLUSION

For the reasons set forth herein:

1.    Defendants' motion (Doc. 67) for summary judgment is **granted** as to all claims and this case is **dismissed with prejudice**.  Judgment shall enter in favor of the defendants.

2.    Sires' motions (Docs. 42, 45 and 86) for summary judgment are **denied** as moot.

3.    The trial of this case, which is currently set to begin April 1, 2024, is **cancelled** and the Clerk of Court shall **close this case**.


**IT IS SO ORDERED** this 28th day of February, 2024.


_____
Leonard T. Strand
United States District Judge